UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TRUMAN HOLMES,
PLAINTIFF

CASE NO. 1:08CV241
(WEBER, J.)
(HOGAN, M.J.)

VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

## REPORT AND RECOMMENDATION

Plaintiff filed his applications for Disability Insurance Benefits and Supplemental Security Income in June, 2004. His applications were denied both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) in Cincinnati, Ohio in June, 2007. Plaintiff, who was represented by counsel at the hearing, testified as did Vocational Expert (VE) Stephanie Barnes. The ALJ reached an unfavorable decision in July, 2007, following which Plaintiff requested review by the Appeals Council. In February, 2008, the Appeals Council denied review and in April, 2008, Plaintiff timely filed his Complaint with this Court.

## STATEMENTS OF ERROR

Plaintiff asserts three "specific errors" he alleges that the ALJ committed. These are as follows: "(1) the decision of the Administrative Law Judge does not contain an adequate evaluation of the claimant's complaints and their impact on his residual functioning, (2) the ALJ decision is erroneous as a matter of law because the ALJ, without the guidance of a trained medical expert at the hearing, improperly determined that the claimant does not have an

impairment or combination of impairments that meets or equals one of the listed impairments in 20 C.F.R. Part 404, and (3) the ALJ improperly substituted his own judgment for the medical judgment of the claimant's treating physicians."

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that Plaintiff suffered from degenerative arthritis of the back and left knee, hypertension, hypertensive heart disease, obstructive hypertrophic cardiomegaly, residuals of balloon angioplasty, depression and drug/alcohol abuse/dependence. The ALJ found all of these impairments to be severe, but none, either alone or in combination, met any Listing. The ALJ further found that Plaintiff had the residual functional capacity to perform his past relevant work as a hand packer, a job which is performed at the medium exertional level.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he lives with two sisters and a brother in Hampton, Ohio and that he last worked as a grill cook at Hyde's Restaurant in the first quarter of 2004. Plaintiff testified that he is right-handed, 5'10" tall and weighs 201 lbs. He has a 12th grade education. Prior employment was a hand packer and mail carrier.

When asked why he couldn't return to a cooking job, Plaintiff responded that he had two deteriorating discs in his spine, arthritis, painful knees, hammer toes, headaches and dizzy spells upon sudden movement. Plaintiff also stated that he has an enlarged heart, experiences chest pains and has small arteries. He indicated that his primary care physician is Dr. Ramirez and that his orthopaedic surgeon in Dr. Ahmed. Plaintiff testified that he has had acupuncture treatments for his back pain, surgery on a shoulder and has had shoulder injections.

In March, 2007, Plaintiff was involved in an automobile accident and fractured his right tibia below the knee. Plaintiff admitted to the use of alcohol and Cocaine, the latter of which he purchases from street sellers, and admitted having been in prison. He has not been able to cook or do laundry since the accident. He has difficulty sleeping at night and takes naps. Plaintiff

2

estimated that he could lift 10-15 lbs. and sit for 15-20 minutes without a break. He could stand about 15-20 minutes without a break.

Plaintiff testified that he suffers from sleep apnea, which has worsened since the accident, and that his inability to sleep at night plus his medications, result in his need to nap during the day. Plaintiff indicated that he has trouble remembering and concentrating and that these problems worsened near the end of his tenure at Hyde's Restaurant. Plaintiff clarified that he cannot sit or stand for long periods of time. He resigned from Hyde's when he experienced nosebleeds as well as back and toe pain. (Tr. 542-583).

Plaintiff's application for benefits disclosed that he was born in February, 1946, is presently divorced and has no dependent children. (Tr. 72-76).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE a total of four hypothetical questions, each based on a different set of assumptions. The first, the one ultimately accepted by the ALJ, asked the VE to assume that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently, can occasionally climb ladders, ropes and scaffolds, can occasionally kneel, crouch and crawl, should avoid concentrated exposure to temperature extremes and avoid working around unprotected heights and hazards. The VE was further asked to assume that Plaintiff is not significantly limited in his ability to cope with job stress and that he is able to get along with others, understand, remember and follow complex instructions, able to sustain persistence, pace and concentration and complete moderately complex tasks. The VE responded that if all these assumptions were accurate, Plaintiff could perform the job of hand packer, but not perform the job of cook.

The second hypothetical asked the VE to assume that Plaintiff could stand/walk for 3 hours without interruption, sit for 1 hour without interruption, and could lift 11-20 lbs. occasionally and 6-10 lbs. frequently. Plaintiff had marked limitations of his ability to bend and make repetitive foot movements. The VE responded that Plaintiff would be unemployable.

The third hypothetical asked the VE to assume that Plaintiff could stand/walk for 8 hours in a workday, but not more than 1 hour without a break and lift and carry 6-10 lbs. frequently.

The VE responded that Plaintiff would be unable to perform work at the light exertional level, but could perform sedentary work.

The fourth hypothetical, referred to as the "third" by the ALJ, asked the VE to assume the accuracy of Plaintiff's testimony. The VE responded that Plaintiff would be unemployable.

## THE MEDICAL RECORD

Plaintiff's medical record begins with records from the Ohio Department of Jobs and Family Services and a form completed by Nurse Brenda Young. Ms. Young indicated in July, 2004, that Plaintiff had been diagnosed with hypertension, hepatitis C, osteoarthritis and alcohol abuse. He was receiving no current treatment or medications for hepatitis C or alcohol abuse. Ms. Young opined that Plaintiff could stand/walk for 3 hours in a workday and sit for1 hour, lift 6-10 lbs. frequently and 11-20 lbs. occasionally. He was markedly limited in his ability to bend and make repetitive foot movements. Ms. Young expressed the opinion that Plaintiff was unemployable.

Adrienne Swift, Ph.D., a clinical psychologist with the Butler County Department of Jobs and Family Services, concluded in July, 2004 that Plaintiff had no marked limitations, but was moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, work in connection with others without being distracted by them, and was also moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Swift said that her examination showed that Plaintiff had a normal affect and normal memory, but had a moderate level of depression. His primary mental health issue was substance dependence. With treatment, she felt that "Plaintiff should be employable." (Tr. 193-194).

On a similar form to the one completed by Nurse Brenda Young, Ashok Kejriwal, M.D., an internist, concluded in August, 2002, that Plaintiff's hypertension was severe and uncontrolled, but that his arrhythmia was stable with treatment. Dr. Kejriwal opined that Plaintiff could stand/walk for 8 hours and for 1 hour without interruption. He indicated that Plaintiff could lift 6-10 lbs. frequently. Dr. Kejriwal said that Plaintiff had no marked

4

limitations, but that his abilities to push/pull, bend, make repetitive movements with his left leg and see were all moderately limited. Unlike Nurse Young, Dr. Kejriwal felt that Plaintiff's impairments would last for less than 1 year, but both felt that Plaintiff was currently unemployable. (Tr. 196-197).

In July, 2002, Dr. Kejriwal said that Plaintiff's impairments, arthritis and severe uncontrolled hypertension, were expected to last 6-9 months and that he should perform sedentary jobs. In August, 2002, Plaintiff indicated on Dr. Kejriwal's Health History Questionnaire that he was taking prescribed Clonidin and Viox and that he had been hospitalized three times, once for a heart problem in the 1970s and twice for elevated blood pressure in the 1980s. His blood pressure in September, 2002 was 202/110. (Tr. 210).

Plaintiff was examined in December, 2002 by Mary Johnson, M.D. Plaintiff complained to Dr. Johnson about persistent hypertension and long-standing arthritis in his lower back, right ankle and left arm. Plaintiff reported that he was taking Lotrel, Lisinopril, Hydrochlorothiazide and Celebrex and that he saw sees Dr. Ahmed for his back problems. He has had no surgery nor steroidal injections. His arm and ankle pain have never been evaluated. Dr. Johnson felt that Plaintiff has "mild degenerative arthritis," but no radiculopathy. She found nothing abnormal in Plaintiff's left elbow or right ankle. Plaintiff's blood pressure, 180/90, was elevated, but no end organ damage was noted. Dr. Johnson felt that Plaintiff could perform "sedentary, light and intermittent moderate physical activity." (Tr. 222-226).

X-rays of Plaintiff's left knee and lumbar spine were read in December, 2002 by Eli Rubenstein, M.D., who concluded that there was "slight narrowing of the medial compartment of the knee and slight spurring of the anterior superior aspect of the patella." In reference to the x-ray of the lumbar spine, Dr. Rubenstein observed that "There is narrowing of L5-S1." (Tr. 226). Muscle testing was normal. Range of motion studies were normal. (Tr. 228-230).

Plaintiff successfully completed alcohol treatment in January, 2003, although his prognosis was "guarded." (Tr. 232).

An echocardiogram was performed in July, 2004 at Fort Hamilton Hospital. Gregory Parker, M.D., a cardiologist, reported that "Doppler evidence suggests left ventricular apical and mid LV cavity obstruction" and "possible diastolic dysfunction impaired relaxation type." Dr.

5

Parker also reported "borderline dilated left atrium with mitral annular calcification and minimal mitral stenosis." (Tr. 259).

Plaintiff saw Ghazala Malik, M.D. at The Fort Hamilton Hospital Emergency Room in February, 2002 for left knee pain. His blood pressure was 235/128. He was given Vicodin for knee pain and counseled relative to the importance of taking his Clonidine regularly to control his blood pressure. (Tr. 261-263). A second visit in February, 2005, when his blood pressure was 208/120, resulted in similar treatment by Robert Upton, M.D. (Tr. 265-267).

Myocardial perfusion imaging was done at The Fort Hamilton Hospital by Stanley Ignatow, M.D. at the request of Dr. Kejriwal. The result showed "left ventricular enlargement, mid left ventricular hypokinesis with abnormal ejection fraction at 46% and equivocal changes to the inferior wall." (Tr. 269). A stress test was performed in September, 2002. Jithendra Choudary, M.D. reported that Plaintiff achieved 87% of maximum predicted heart rate, had no engima, but baseline ECG showed left ventricular hypertrophy with repolarization, possible inferior lateral ischemia." (Tr. 271).

Plaintiff underwent a Cath Lab procedure in October, 2002 by Dr. Choudary. Results confirmed "mild coronary artery disease in 3 arteries, elevated left ventricular end diastolic pressure and normal global LV function." Dr. Choudary recommended "aggressive treatment of hypertension." (Tr. 274-279).

A polysomnography consultation with Kenneth Wehr, M.D., disclosed a "sleep-related breathing disorder with obstructive sleep apnea syndrome" in September, 2004. (Tr. 281).

A mental Residual Functional Capacity Assessment was done by Joan Williams, Ph.D., a clinical psychologist, in September, 2004. Dr. Williams found no marked limitations in any area, but did indicate that Plaintiff had moderate limitations with regard to his ability to maintain attention and concentration for extended periods, complete a normal workweek without interruptions from psychologically-based symptoms, accept instructions and respond appropriately to criticism. The diagnosis was depression and substance dependence. Douglas Pawlarczyk, Ph.D. agreed. (Tr. 282-297).

A Physical Residual Functional Capacity Assessment was done in February, 2005 by Sarah Long, M.D. Dr. Long said that Plaintiff could lift 50 lbs. occasionally and 25 lbs.

frequently. He could stand/walk for 6 hours and sit for 6 hours in a workday. He could occasionally climb ladders, ropes, scaffolds and occasionally kneel, crouch and crawl. Dr. Long specifically disagreed with the assessment done by Brenda Young, R.N. and found her assessment "not consistent with the medical evidence of record." Erin Perencevich, Ph.D. agreed. (Tr. 298-303).

Plaintiff underwent a surgical procedure called "septoplasty and bilateral inferior tubinectomies" in October, 2004 at the Butler County Medical Center by Neil Okum, M.D. for the correction of a deviated septum. (Tr. 306-308).

Plaintiff was treated at Butler County Community Health Center for a number of medical conditions: sleep apnea, diabetes, high blood pressure, arthritis, chronic back and knee pain and insomnia. X-rays taken in February, 2004 of the left knee were normal; x-rays of the lumbosacral spine showed narrowing at L4-5 and L5-S1 and spurring at L5-S1. (Tr. 310-339).

William Baker, M.D., a cardiologist, reported in August, 2004 that he saw Plaintiff for complaints of dizziness. Dr. Baker thought Plaintiff's dizziness was "orthrostatic hypotension, probably due to his left ventricular hypertrophy." Dr. Baker opined that Plaintiff had left ventricular hypertrophy secondary to his hypertension. (Tr. 341-342). Myocardial perfusion imaging in February, 2004 showed "no evidence of reversible myocardial ischemia, but a borderline left ventricular chamber size and a low normal ejection fraction of 51%." (Tr. 343). In December, 2004, Dr. Baker reported that he did not believe that Plaintiff's headaches were related to his hypertension, which was reasonably controlled. (Tr. 345-346).

Dr. Choudary performed an invasive coronary procedure in June, 2006 in the cath lab. at Fort Hamilton Hospital. Four coronary arteries were investigated, two of which were found to have coronary artery disease, the left anterior descending coronary artery and the circumflex coronary artery. In addition, it was discovered that Plaintiff had "normal left ventricular end diastolic pressure and a hyperdynamic left ventricle with an estimated ejection fraction greater than 75%. (Tr. 375-378).

An emergency room visit for dizziness was made in October, 2006. Alan Summe, M.D. attributed Plaintiff's problem to being "a little intoxicated." (Tr. 384-386). In November, 2006, Plaintiff was again seen in the emergency room for chest pain. Susheela Rajan, M.D. concluded

7

that Plaintiff has "two-vessel coronary artery disease" and "poor control of his hypertension." (Tr. 388-394).

Thomas Murtaugh, M.D., a cardiologist with the Ohio Heart and Vascular Center, reported in October, 2006 that Plaintiff was treated with stenting in multiple areas of the right coronary artery and was advised to stop smoking and drinking. Plaintiff treated with Dr. Murtaugh from October, 2006 through December, 2006.

Balloon angioplasty was performed in June, 2006 by Sambbu Choudhury, M.D. at The University Hospital. Because of his unstable angina, Plaintiff was not felt to be a candidate for stress testing. "The right coronary artery had focal lesions of 60-70% in the mid third of the vessel, followed by a more distal 70% stenosis, followed by an 80% stenosis a bit further distally." As a result of the procedure, the "most proximal lesion was felt to improve to about 20% stenosis intensity, the middle lesion 20% stenosis, and the more distant lesion 10% stenosis." (Tr. 408-409). An echocardiogram in June, 2006 showed "hyperdynamic left ventricle systolic function with likely hypertensive heart disease." (Tr. 435-436).

In March, 2007, Plaintiff was involved in an automobile accident in which he was struck by an SUV on his left side. Plaintiff was rendered unconscious and complained of neck and back pain while in the emergency room at University Hospital. He suffered a "left tibial plateau fracture" and a "left parietal scalp hematoma." (Tr. 455-457 and 478-482) He also suffered a "nondisplaced C7 transverse process fracture, which was "nonoperative." He developed pneumonia, which was successfully treated. Doctors recommended that he stop Metropol and substitute Labetol for hypertension because of continued cocaine use. (Tr. 462-463). The fracture was repaired by Abdul Ahmed, M.D. (Tr. 499-500).

X-rays were also taken of Plaintiff's left shoulder in March, 2007. The impression gained was "AC joint separation and irregularity of the distal clavicle." (Tr. 487). X-rays of the thoracic spine showed "degenerative changes at T9-10 with mild disc space narrowing and hypertrophic bone perforation." X-rays of the lumbosacral spine showed "mild disc narrowing at L4-5 and L5-S1" and "endplate sclerosis at L4-5 and L5-S1. There is some hypertrophic bone formation from L4 through S1." (Tr. 488).

In June, 2006, Plaintiff complained of pain and numbness in his left hand and difficulty

8

lifting and holding objects. He had limited range of motion in the wrist and some swelling, but was able to make a fist and had good grip power. The clinical impression was carpel tunnel syndrome. He was given a wrist brace and prescribed Vicodin and Motrin. (Tr. 511). A left carpel tunnel release procedure was performed in August, 2006 by Dr. Ahmed. (Tr. 518-519).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that

the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen*, No. 87-6189, slip op. At 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a

"slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980);

11

*Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary*

*of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine

issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely

involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

The First Statement of Errors criticizes the ALJ for his evaluation of the medical evidence. We disagree that the criticism is legitimate. The evaluations most favorable to Plaintiff came from Nurse Brenda Young, Dr. Kejriwal and Dr. Adrienne Swift. Brenda Young, R.N. is a nurse practitioner employed, not in a treatment capacity, but as an evaluator by the Ohio Department of Jobs and Family Services. In her opinion, Plaintiff had marked limitations of his ability to bend and make repetitive foot movements. She opined that Plaintiff should lift no more than 6-10 lbs. frequently and 11-20 lbs. occasionally. She would limit Plaintiff to standing/walking for 3 hours and sitting for 1 hour in a workday. Plaintiff sustained a fracture of his left tibia, which was surgically repaired in April, 2007. The surgeon, Dr. Ahmed, related that the broken bone should heal adequately within one year. Although one might reasonably consider an accommodation because of a relatively recent injury, Dr. Ahmed did not report that Plaintiff should avoid repetitive movements with his left leg, nor is there any evidence to suggest that Plaintiff should avoid repetitive movements with his right leg. Even if there was, the job of packer does not involve any repetitive leg movements, so the ALJ's evaluation of Ms. Young's opinion as entitled to "no weight" is correct at least insofar as she considered Plaintiff to have "marked limitations" of his ability to make repetitive movements with his legs.

Nurse Young also limited Plaintiff relative to his ability to lift, stand/walk and sit during a typical workday. The concern here was in relation to x-rays of Plaintiff's lumbar spine, which showed "narrowing at L5-S1" in December, 2002, "narrowing at L4-5 and L5-S1" in February, 2004 and "mild disc narrowing at L4-5 and L5-S1" as well as "endplate sclerosis at L4-5 and L5-S1" in March, 2007. However, Nurse Young's opinion regarding Plaintiff's ability to lift was shared by Dr. Kejriwal, who limited Plaintiff to lifting 6-10 lbs. frequently, but he disagreed that Plaintiff had any marked limitations and found only a moderate limitation of Plaintiff's ability to make repetitive movements with his left leg. Dr. Kejriwal expressed the opinion that Plaintiff was presently (as of August 22, 2002) unemployable, but he also said that Plaintiff's limitations were expected to last between 9 and 11 months. On another form, Dr. Kejriwal indicated that he thought Plaintiff was able

to do sedentary work. Dr. Kejriwal is an internist, who saw Plaintiff a total of 7 times from July to October, 2002. The ALJ gave "no weight" to the opinion of Dr. Kejriwal, a view which strikes us as somewhat surprising, since he was a treating physician. On the other hand, the ALJ's reason for discounting Dr. Kejriwal's opinion was that Plaintiff worked as a cook, a job he performed at the medium exertional level, after Dr. Kejriwal expressed the opinion that Plaintiff either was unemployable or capable of only sedentary work. That actions speak louder than words is a principle quite applicable to the determination of the credibility of an expert opinion.

It is also apparent that Dr. Kejriwal's opinion was inconsistent for the reason previously discussed, and also opposed by that of Dr. Long, as supported by Dr. Perencevich, paper reviewers, but who felt that Plaintiff could stand/walk and sit for 6 hours in a workday and also felt that Plaintiff could lift 50 Ibs. occasionally and 25 lbs. frequently. We conclude that the ALJ's rejection of Dr. Kejriwal's opinion was not erroneous.

Dr. Swift is a clinical psychologist with the Butler County Department of Jobs and Family Services. Although the ALJ was correct in his assertion that Dr. Swift only saw Plaintiff once in July, 2004, we question the decision to give her opinion "no weight." Although the ALJ infers that Dr. Swift found Plaintiff mentally disabled, we do not read her report to so state. What she reported was that Plaintiff had a moderate level of depression, but that his "primary mental health issue was substance abuse." She found that he would profit from substance dependence treatment and "should be employable." Dr. Swift's conclusion was supported by the opinions of Drs. Williams and Pawlarczyk. While we question why the ALJ would reject the opinion of Dr. Swift, there can be no error prejudicial to Plaintiff because Dr. Swift was not much help to Plaintiff, notwithstanding the ALJ's giving her opinion "no weight."

It is not the ALJ's treatment of the conclusions of Nurse Young or Drs. Swift and Kejriwal that gives us a degree of concern, rather it is the conclusions of Mary Johnson, M.D., an examining physician, versus the conclusions of paper reviewers. Dr. Johnson agreed with the conclusions of Drs. Rubenstein, Nurse Young, Dr. Kejriwal and Drs. Young and Perencevich that Plaintiff has some degree of degenerative disc disease in his lumbar spine, although she described it as "mild." Dr. Johnson reported, however, that Plaintiff used a heating pad to alleviate back pain, but had never had steroidal injections, nor had any back surgery. He did not wear a brace, nor use a bedboard.

16

Although Plaintiff's heart problems developed after Plaintiff saw Dr. Johnson, she recommended light or sedentary work, not medium work as the ALJ determined Plaintiff could perform.

The only position opposed to Dr. Johnson was the view expressed by the paper reviewers, Drs. Young and Perencevich, who disagreed, but who also had information relative to Plaintiff's heart problems, since their analysis was done in February, 2005, not December, 2002 as was Dr. Johnson's. The paper reviewers found Plaintiff could perform medium work. Although Plaintiff was treated by Drs. Parker, Ignatow, Choudary, Okum, Baker, Rajan and Murtaugh, all cardiologists, none voiced an opinion what he could or could not do. However, a review of the record shows that Plaintiff has mild coronary artery disease in three arteries and an enlarged left ventricle. Balloon angioplasty was performed. We know that Plaintiff suffers from occasional chest pain and that stress testing was not recommended in June, 2006. Stress testing constitutes strenuous exercise. We also know that Plaintiff has hypertension because all the cardiologists agree on that point. We also know that Plaintiff's cocaine usage interfered with his blood pressure medication and the record shows that sometimes, Plaintiff's hypertension is under control with medication and sometimes it is not.

While we might have restricted Plaintiff to light work in accordance with Dr. Johnson's opinion, the paper reviewers disagreed and did so after a more complete record, including some of Plaintiff's cardiac records, which Dr. Johnson could not have had. We cannot say that substantial evidence does not support the ALJ's conclusion that Plaintiff's *orthopaedic* impairments would permit him to perform medium work in light of the opinions of Drs. Long and Perencevich, as well as the activities Plaintiff was able to perform after he left work at Hyde's Restaurant.

Plaintiff has sleep apnea, but his deviated septum was corrected by a surgical procedure in October, 2004. He also has carpel tunnel syndrom in his left hand, which causes some swelling, pain and a limited range of motion in his left hand. Plaintiff is right handed. That condition was also addressed by a surgical procedure in August, 2006. As previously discussed, Plaintiff suffers from depression, but Dr. Williams found no marked limitations. The ALJ did consider all Plaintiff's impairments in combination. The ALJ's ultimate conclusions were not erroneous.

The Second Statement of Errors faults the ALJ for failing to secure the opinion of a medical expert and affirmatively asserts that Plaintiff's impairments actually meet Listing 1.02(A) and 1.04(A). Listing 1.02(A) requires a showing of "gross anatomical deformity" plus "chronic joint pain

17

and stiffness, limitation or other abnormal motion" as well as "findings of joint space narrowing, bony destruction or ankylosis." The Listing requires that the affected joint be a knee, hip or ankle and that there be "an inability to ambulate effectively," which is defined as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities." Plaintiff has presented some evidence through Dr. Rubenstein's x-rays of Plaintiff's left knee that he has "slight narrowing and spurring" in the joint" and his treatment at Butler County Community Health Center was for "chronic knee pain." However, range of motion studies were positive and there is no proof that Plaintiff needs a cane to ambulate and certainly no proof that he cannot ambulate effectively without a hand-held device. Plaintiff failed to meet Listing 1.02(A).

Listing 1.04(A) requires "herniated nucleus pulposis, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal chord with evidence of nerve root compression accompanied by sensory or reflex loss and positive straight leg raising." Plaintiff has demonstrated that he has osteoarthritis and degenerative disc disease, but his evidence falls short of demonstrating that there is nerve root compression or radiculopathy. He certainly does not meet Listing 1.04(A).

The ALJ is not required to secure the services of a medical expert, but has the discretion to make that decision under all the facts of circumstances of an individual case. Plaintiff's sleep apnea and carpel tunnel syndrome are minor issues in the big picture. His left knee and low back problems are more significant, but neither is Listing level. Plaintiff's cardiac problems are far more significant and certainly bear on whether or not he can tolerate the exertional requirements of medium work. None of the cardiologists who treated Plaintiff completed a residual functional capacity assessment indicating whether or not Plaintiff can tolerate the exertional requirement of medium work. All we know is that stress testing was inadvisable because of Plaintiff's cardiac condition. We also know that the job of hand packer does not require one to climb ropes, yet the ALJ's residual functional capacity assessment would permit such activity, an assessment which is faulty in light of Plaintiff's heart condition. We do find that a medical expert, a cardiologist, should have been called to review the record and voice an opinion whether or not Plaintiff has the capacity to perform medium work. Plaintiff's Second Statement has merit and supports a decision to remand this case to the ALJ to

18

secure the services of a medical expert.

The Third Statement of Error is merely a restatement of the Second. We do not agree that the ALJ substituted his own judgment for the medical judgment of Plaintiff's treating physicians. The problem in this case is that Plaintiff's treating physicians voiced opinions on non-Listing level impairments and on the one potentially significant impairment, no cardiologist stepped to the plate. The ALJ should have recognized that one with a heart condition may not be able to lift 25 lbs. frequently.

For the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence and should be reversed.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish Plaintiff's entitlement to benefits. *Faucher*, 17 F.3d at 176. This matter should be remanded for further proceedings, including the review and testimony of a cardiologist, who can formulate an opinion on Plaintiff's ability to perform the exertional requirements of medium work; and further vocational considerations consistent with this decision.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

February 24, 2009

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).